Joshua Jordan, PRO SE
3223 Twin Church Rd
Timmonsville, SC 29161
joshlegalstuff@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JOSHUA JORDAN<br><br>Plaintiff,<br><br>v.<br><br>PAYMENT SAVER, LLC<br>and<br>CASEY GRAHAM<br>Defendants. | Case No.:<br><br><br>COMPLAINT |

**INTRODUCTION**

This is an action for tortious interference with contractual relations and a federal claim under the Lanham Act.

**NATURE OF THE ACTION**

1. This is an action arising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for false and misleading commercial advertising and promotion, together with related claims for tortious interference with contractual relations. The gravamen of this action concerns false commercial statements published by Defendants in interstate commerce through the LinkedIn professional networking platform, reaching approximately one million viewers across forty-three states and causing documented damages exceeding $18.2 million to Plaintiff's commercial interests.

2. Defendant Casey Graham ("Graham"), as founder, member, and the Chief Executive Officer of Defendant Payment Saver, LLC (doing business as "Gravy Solutions" or "Gravy"), engaged in a calculated campaign of false commercial speech designed to

unfairly compete with and destroy Plaintiff's business enterprise. Graham's commercial statements, disseminated through his business profile on LinkedIn where he actively markets paid consulting services, falsely disparaged Plaintiff's business practices to an audience of potential customers, business partners, and investors. These false commercial statements had their intended effect - directly causing the termination of 729 customer contracts across 43 states, the dissolution of over 100 technology company partnerships, and the withdrawal of $10 million in committed investment capital.

3. The interstate scope and substantial commercial impact of Defendants' false advertising campaign brings this matter squarely within the Lanham Act's core purpose of protecting businesses against unfair competition through false commercial speech. As the Supreme Court recently reaffirmed, the Lanham Act provides a federal remedy when false commercial advertising causes direct competitive injury across state lines. See, e.g., Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 131-32 (2014) (confirming Act's protection extends to parties suffering "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising").

4. The documented interstate commercial impact of Defendants' false statements - destroying customer relationships across 43 states, disrupting national technology partnerships, and derailing eight-figure investment transactions - demonstrates precisely the type of substantial effect on interstate commerce that the Lanham Act was designed to address. This action seeks remedies expressly authorized by the Act, including treble damages, disgorgement of profits, and attorney fees, together with relief for Defendants' tortious interference with Plaintiff's business relationships.

**PARTIES**

5. Plaintiff Jordan is an individual residing in Florence County, South Carolina and the owner former CEO Prehired, LLC, and the assignee of all claims Prehired may have against Graham and Gravy.

6. Defendant Casey Graham ("Graham") is an individual residing in Forsyth County, Georgia. Graham is the Chief Executive Officer, member, and founder of Defendant Gravy Solutions.

7. Defendant Payment Saver, LLC, is a Georgia limited liability company with its principal place of business located at 3925 River Place Drive, Cumming, GA 30041. Defendants Graham and Gravy are jointly and severally liable for the misconduct alleged herein. Acts taken by Graham were performed in his capacity as CEO and controlling member of Gravy and were authorized, ratified, adopted and/or agreed to by Defendant Gravy as corporate misconduct.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 15 U.S.C. § 1121 (action arising under the Lanham Act). Jurisdiction is also asserted under 28 U.S.C. § 1332 (diversity of citizenship), to the extent that complete diversity exists, with the amount in controversy exceeding $75,000.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district. Defendants caused substantial harm to Plaintiff Jordan, a resident of South Carolina, by publishing false and defamatory statements concerning Jordan and his South Carolina-based company, Prehired.

10. This action is filed concurrently with a pending appeal in the United States Court of Appeals for the Fourth Circuit, Case No. 25-1052, involving substantially similar claims. In the event the

Fourth Circuit reverses the district court's dismissal and remands the original action for further proceedings, Plaintiff expressly reserves the right to voluntarily dismiss this action pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). This protective filing is necessitated solely by statute of limitations concerns and is not intended to create duplicative litigation.

11. Furthermore, should this Court determine it lacks subject matter jurisdiction, Plaintiff respectfully requests transfer to the South Carolina Court of Common Pleas pursuant to 28 U.S.C. § 1631 rather than dismissal. The Supreme Court has recognized that where a dismissal would preclude refiling due to statute of limitations, transfer rather than dismissal best serves the interest of justice. See Goldlawr, Inc. v. Heiman, 369 U.S. 463, 467 (1962); see also Miller v. Hambrick, 905 F.2d 259, 262 (9th Cir. 1990) ("Normally transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is 'time-consuming and justice-defeating.'").

## FACTUAL ALLEGATIONS

### Background on Plaintiff Jordan

12. Plaintiff Jordan is the founder and former Chief Executive Officer of Prehired, a company that successfully helped individuals from diverse backgrounds build skills and transition into careers in technology sales through its innovative training program.

13. Jordan has a distinguished reputation as an ethical businessman, church leader, and dedicated to community involvement and charity. For example:

   a. Jordan has donated 10% of his income to church and charitable causes since age 18, consistent with the strong values for generosity and compassion instilled by his family.

b. While living in Tokyo, Japan from 2009–2013 and working full time as an English teacher making approximately $30,000 per year, Jordan volunteered over 20 hours per week supporting underprivileged communities through his church and helping to establish brand new churches in a country that is less than 1% Christian.

c. In 2021, Jordan established the WePay Foundation, a non-profit organization, to help struggling individuals and families pay overdue bills. Although WePay has been unable to become fully operational due to the financial troubles at Prehired caused by Defendants' tortious conduct described herein, Jordan provided $2,500 in personal funds as an initial seed donation in November 2021 to sponsor a Thanksgiving event that fed over 200 underprivileged people in Charleston, South Carolina.

d. Through Prehired, Jordan assisted more than 1000+ talented individuals in building professional careers in technology sales, with the average member doubling their income from ~$35,000 to ~$70,000 in under a year, and enhancing their lives and providing economic stability for their families. It is estimated that Jordan and his company has created an additional $30,000,000.00 each year in income for Prehired members as of 2022 and the amount continues to increase as each person continues to grow in their career with more earning potential.

### The Success of Prehired Under Jordan's Leadership

14. Launched in 2017 and led by Jordan as CEO, Prehired became an award-winning company recognized for training quality and member outcomes. For example:

a. Well-respected companies HubSpot and CareerKarma ranked Prehired's training program among the best in the sales industry.

   b. By 2022, Prehired had developed strong relationships with over 100 technology companies that frequently hired Prehired members.

   c. Over 90% of Prehired members found jobs within 6 months of completing the program averaging a doubling of income to $70k a year after finishing the first program.

   d. Prehired members improved their incomes substantially thanks to career opportunities facilitated by Prehired's affordable training model, often doubling their income from before joining Prehired.

   e. Jordan was voted as Sales Hacker's (now GTMnow.com) Top 10 Sales Leadership Winner of 5000 Nominees Worldwide.

15. Prehired charged fees via Income Share Agreements ("ISAs"), under which members owed nothing upfront and only paid a portion of income earned after being hired, starting a business, or choosing to pause their membership. This innovative model expanded access to sales training and career access for lower income individuals with no experience or qualifications.

16. Under Jordan's leadership, Prehired helped over 1,000 people improve their lives and supported employees to grow professionally. As shown by more than 500 third party hosted member testimonials, Jordan and his team cared deeply about member success – many of which have been curated at https://www.prehired.io/reviews. See Exhibit J for 1-11.

### Defendants' False and Defamatory Statements

17. Defendant Graham is the founder and CEO of Defendant Gravy, a payment processing company. Graham frequently posted on LinkedIn to promote himself and his business. His LinkedIn Profile Headline states, "I write 1 email a week to 5,397 leaders. If you want to advance as a leader… Read my ABOUT section on profile."

18. On February 22, 2022 at approximately 10:15 pm Eastern Standard Time, Graham published the following post on his personal LinkedIn profile:

    "I just learned that we had someone on our team from PreHired. That company is absolutely predatory! Taking 12.5% of the candidates monthly gross salary!!! WHAT THE ABSOLUTE HELL? Dear PreHired, Here is my mailing address....P.O. Box 2992 Cumming, GA 30028. Send all your legal team to that address, not theirs...We are back paying them the 12.5% that you ruthlessly took from people in desperate situations! If you are a CEO and you have anyone hired by this company, I'm asking you to back pay them what they have paid and FIRE PREHIRED & bring it on... You will no longer take advantage of our team that are looking to get started in their career! Who will FIRE PREHIRED with me?" See Exhibit A.

19. Graham's February 22, 2022 LinkedIn post is riddled with wildy false, defamatory, and recklessly harmful statements about Prehired and Jordan. These statements reveal a calculated disregard for the truth and an intentional effort to sow chaos and inflict financial damage on Prehired while positioning himself as a champion of social justice. In reality, his actions were entirely self-serving—designed to harm Prehired, draw attention to himself, and ultimately profit by capturing Prehired's customers. Graham's virtue signaling was nothing more than a thinly veiled attempt to boost his own reputation, and in the process, he achieved his goal: harm to Prehired, public attention, and access to Prehired's customer base for his own benefit. His statements included:

    a. Describing Prehired as "absolutely predatory" and falsely claiming that the company "ruthlessly" extorted money from people in "desperate situations," despite no factual basis for such a description.

b. Falsely declaring that he, personally, would make payments to Prehired customers to "refund" money that Prehired allegedly took improperly, presenting himself as some self-appointed arbiter of justice with no legal right or responsibility to do so.

c. Instructing Prehired customers to stop making the payments they were contractually obligated to make under valid contracts, intentionally encouraging breach of contract and further damaging Prehired's financial stability.

d. In a bizarre and preposterous move, Graham preemptively instructed Prehired to contact Gravy's legal team to fix the mess that **he himself** had caused, positioning himself as the solution to the very problem he manufactured. He offered to "back pay" Prehired customers himself as if he had any legitimate authority or obligation to do so, creating a surreal and hostile scenario for Prehired.

e. Calling on other executives and CEOs to "FIRE PREHIRED," using his influence to incite others to boycott and sever business relationships with Prehired based entirely on his fabricated narrative.

20. Defendants' statements constitute commercial speech made in commercial advertising and promotion within the meaning of 15 U.S.C. § 1125(a) for the following reasons:

a. Graham's statements were made in his capacity as CEO of Payment Saver, LLC, and prominently featured his commercial position and business credentials;

b. The statements were disseminated on LinkedIn, a platform primarily used for business and professional networking, where Graham maintained an active commercial presence promoting his business services;

c. Graham's LinkedIn profile headline explicitly marketed his commercial services, stating "I write 1 email a week to 5,397 leaders. If you want to advance as a leader... Read my ABOUT section on profile";

d. The statements were designed to promote Graham's competing business services, as evidenced by his subsequent LinkedIn posts boasting of earning "$2,995,000 off LinkedIn over 27 months" and "making $3,000,000 off LinkedIn" through consulting and coaching services;

e. Graham's statements directly targeted Plaintiff's customer base to redirect them to his own commercial offerings, including coaching and consulting services ranging from $15,000-$30,000 in fees;

f. The commercial nature of Graham's motivation is further evidenced by his May 7, 2022 post highlighting a trip to Richard Branson's estate as a purported business coaching client, demonstrating his intent to leverage the defamatory statements for commercial gain.

21. On February 23, 2022 at approximately 8:52 pm Eastern Standard Time, Graham published another post on LinkedIn praising two individuals, Erik McKee and Darren McKee, as alternatives for sales training while referring to Prehired's fees as "predatory."

"Instead of paying a preditory 12.5% of your salary as an SDR And instead of paying 30k to PreHired Do yourself a favor and trust me with this. Meet Darren McKee & Erik McKee They sat on my back porch last night and shared their stories of breaking into SaaS as SDR's I have zero to gain from this. Join their mailing list to learn how to break into SaaS FOR FREE. They will 100% take care of you.I 100% endorse them. Great humans.They will help you with no strings attached. Follow them and learn from them. Link in comments for SDR's and people looking to break into being one." See Exhibit B.

### Resulting Damages

22. **As a direct result of Graham's false and misleading statements, Plaintiff has suffered losses of approximately $18,225,000 from 729 affected Prehired customers across 43 states. See Exhibit A. The interstate nature and substantial impact of Graham's statements materially affected Prehired's business operations and customer relationships across state lines.**

23. Companies that were hiring and recruiting Prehired members severed those business relationships as a direct result of Defendants' tortious statements, causing estimated damages of $3.4 million.

24. The investment group Stride, was ready to provide $10 million in capital for Prehired's expansion but canceled those plans after seeing Defendants' false claims on LinkedIn, resulting in losses far greater than $10 million when considering future equity value. See Second Declaration of Joshua Jordan Dkt No. 25.

25. The reputational harm and lost revenues forced Prehired to file bankruptcy only 9 months after Defendants' posts. Prior to Defendants' interference, Prehired was projecting over $100 million in revenue over the next 3 years as it continued its rapid expansion.

26. The specific financial damages suffered by Plaintiff include:

    a. Direct Customer Loss:

      - 729 affected customers across 43 states ceased payments

      - Average contract value: $25,000 per customer

      - Total direct customer loss: $18,225,000

      - Geographic distribution detailed in Exhibit C demonstrating interstate commerce impact

    b. Lost Business Relationships:

      - 100+ technology company partnerships terminated

- Average annual revenue per partnership: $34,000

- Total partnership revenue loss: $3,400,000

c. Lost Investment Capital:

- Stride investment group withdrew $10,000,000 commitment

- Projected equity value loss: $30,000,000 based on industry standard multiples

- Additional growth capital opportunities foreclosed: $20,000,000

d. Reputational Damage:

- LinkedIn post reach: approximately 1,000,000 viewers

- Industry reputation destruction in 43 states

- Loss of future business opportunities: $28,000,000 (calculated based on projected revenue growth)

e. Causation is directly established through:

- Temporal proximity of losses to Defendants' statements

- Written communications from customers citing Defendants' statements

- Documentary evidence of investment withdrawal

- Contemporaneous market data showing immediate impact

## Defendants' Knowing and Intentional Misconduct

27. Defendant Graham has openly bragged about his success, wealth, and industry influence on LinkedIn. See Exhibits D - H (to be supplemented).

28. Graham made false claims about Prehired and Jordan to promote his own brand and companies, attempting to attract customers by unfairly denigrating Prehired.

29. Graham intentionally interfered with Prehired's contractual relationships with members/customers with knowledge that those relationships would be severely damaged.

30. Despite being CEO and professional who knew what he was doing, Graham falsely held himself out as someone who could and would make payments on behalf of Prehired customers if they stopped paying Prehired.

31. In reality, Graham sought to undermine Prehired's reputation, customer relationships, and contractual payments owed by convincing members to stop payments without cause, and in exchange gain a larger audience that followed Prehired and Jordan, and expand his competing coaching business services to Prehired customers as they both offered five figure services. Graham and Gravy gained more social media followers, more subscribers to his weekly email to leaders marketed on LinkedIn, and ultimately gained the goodwill and attention of hundreds of thousands of business people, many of whom would be potential paying customers for Graham.

32. Following the defaming and tortious February 2022 posts regarding Prehired and Jordan, Graham made additional posts touting the money, followers and attention he achieved directly through unfairly defaming competitors in order to promote his own commercial services. This further evidences Graham's economic motive and ill-will.

33. For example, on March 25, 2022, Graham boasted "I've made $2,995,000 off LinkedIn over 27 months" while calling people who questioned his coaching services "skeptical/burnt whiners." See Exhibit F (March 25, 2022 LinkedIn Post, to be supplemented).

34. On March 28, 2022, Graham posted that "Today I passed making $3,000,000 off LinkedIn" through various consulting and coaching services he markets on the platform. See Exhibit G (March 28, 2022 LinkedIn Post, to be supplemented).

35. In a post on May 7, 2022 Graham highlighted a trip to billionaire Richard Branson's estate as a purported business coaching client, further showing Graham's pecuniary motivations in making knowingly false statements and tortious interference regarding Jordan and Prehired to gain followers and commercial opportunities. See Exhibit H (May 7, 2022 LinkedIn Post, to be supplemented).

36. Graham had clear financial and reputational incentives to publish false information about Jordan and Prehired. Specifically, Graham sought to attract Prehired's client base, composed of individuals willing to invest substantial sums to improve their careers, to purchase his own coaching, consulting and paid events ranging from $15,000-$30,000 in fees.

37. By unfairly trashing Prehired's services and founder Jordan, Graham endeavored to position himself as a trustworthy ally and alternative source of career advice in order to induce 1000s of Prehired's members to become paying customers.

38. Furthermore, Graham craves the approval and admiration of his social media followers and fellow executives, evidenced by repeatedly showcasing connections with high-profile business leaders, and bragging about his personal wealth.

39. By defaming Jordan, Graham sought personal aggrandizement through publishing virtuous-sounding yet false narratives depicting himself as a protector of exploitation victims and advocate for Prehired's members.

40. However, Graham's statements were at all times motivated by selfish designs for commercial profit, unjustified fame, and vanity.

**CAUSES OF ACTION**

## COUNT I - TORTIOUS INTERFERENCE WITH CONTRACTS AND BUSINESS RELATIONSHIPS

41. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.
42. As CEO of Prehired, Jordan held valid contractual relationships with Prehired customers and prospective business partners.
43. Graham knew of Prehired's contractual relationships but intentionally interfered with them through unfair methods and improper means.
44. Specifically, Graham intentionally published false information about Prehired and told customers to breach contracts by halting payments lawfully owed to Prehired.
45. Graham's intentional interference caused Prehired customers and prospective partners to sever business relationships that would have benefitted Prehired with certainty absent Graham's interference.
46. As a direct and proximate result of Graham's tortious interference, Jordan suffered financial losses through his ownership interest in Prehired, ultimately forcing Prehired into bankruptcy and causing damages estimated to exceed $28 million.

## COUNT II - VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1125(a))

47. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.
48. Defendants Graham and Gravy made false and misleading representations of fact in commercial advertising or promotion, specifically through Graham's LinkedIn posts on February 22, 2022, and February 23, 2022, which upon information and belief, received nearly 1 million views and impressions.

49. These false statements were made in interstate commerce and caused significant harm across at least 43 states, disrupting Prehired's contractual relationships and damaging its customer base.

50. The false and misleading representations include, but are not limited to:

    a. Falsely describing Prehired as "absolutely predatory" and accusing it of ruthlessly exploiting people in "desperate situations";

    b. Falsely claiming that Prehired took 12.5% of candidates' gross salaries, positioning himself as a self-appointed arbiter of justice;

    c. Encouraging Prehired customers to stop making lawful payments under valid contracts, intentionally inciting breach of contract and financial harm to Prehired; and

    d. Preemptively instructing Prehired to contact his legal team to resolve the very chaos he created, offering to "back pay" Prehired's customers in a surreal and baseless attempt to further damage the company.

51. These statements were material and likely to influence the purchasing decisions of Prehired's potential customers, harming Prehired's reputation and business.

52. Defendants' actions have caused significant financial harm to Prehired, including lost revenue exceeding $18 million, a $10 million investment, and the loss of future business opportunities.

53. As a direct and proximate result of Defendants' false and misleading representations, Plaintiff has suffered damages, including reputational harm, financial losses, and the eventual bankruptcy of Prehired.

54. The allegations detailed above demonstrate substantial violations of the Lanham Act warranting the maximum available relief under 15 U.S.C. § 1117(a), including treble damages, disgorgement of Defendants' profits, and attorney fees. The scope and scale of Defendants' false commercial advertising - reaching approximately one million viewers across 43 states and causing

documented damages exceeding $18 million - renders this an "exceptional case" justifying enhanced damages and fee shifting.

**PRAYER FOR RELIEF**

Plaintiff seeks the relief stated below as permitted by South Carolina statutory and common law, including but not limited to: S.C. Code Ann. §§ 15-75-20 (defamation liability), 39-5-140 (tortious business interference liability), 15-33-135 (punitive damages authority). S.C. common law governing injunctive relief, damages, and other equitable remedies sought herein.

WHEREFORE, Plaintiff respectfully requests judgment as follows:

**A. Monetary Relief:**

1. Actual damages for lost profits and business opportunities in an amount no less than $18,225,000;

2. Treble damages pursuant to 15 U.S.C. § 1117(a) in an amount no less than $54,675,000;

3. Disgorgement of Defendants' profits derived from their false advertising, estimated to exceed $3,000,000;

4. Prejudgment interest at the maximum rate permitted by law;

5. Compensatory damages for tortious interference in an amount no less than $28,000,000;

**B. Equitable Relief:**

1. Permanent injunctive relief prohibiting Defendants from making false or misleading statements about Plaintiff or his business enterprises;

2. Corrective advertising to be published by Defendants at their expense;

3. Disgorgement of all unjust enrichment obtained through Defendants' unlawful conduct;

## C. Costs and Fees:

1. Reasonable legal fees and costs pursuant to 15 U.S.C. § 1117(a) as an exceptional case;

2. All costs of this action;

3. Expert witness fees;

4. Investigation costs;

## D. Enhanced Remedies:

1. Enhanced damages based on Defendants' willful and intentional conduct;

2. Punitive damages as permitted by law;

3. Additional relief under 15 U.S.C. § 1117(a) based on the deliberate nature of the violations;

## E. Additional Relief:

1. An accounting of Defendants' profits from their unlawful conduct;

2. Establishment of a corrective advertising fund; and

3. Such other relief as the Court deems just and proper.

Plaintiff specifically reserves the right to amend this Prayer for Relief as additional damages are discovered or incurred.

## JURY TRIAL DEMANDED

Plaintiff Jordan hereby demands trial by jury on all issues so triable.

Respectfully submitted and dated this February 19, 2025

By: /s/ Joshua Jordan
Joshua Jordan, PRO SE
3223 Twin Church Rd
Timmonsville, SC 29161
843.790.3989
joshlegalstuff@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2025 a true and correct copy of this document is being filed in person to the court of clerk and when the clerk uploads the documents to the online docket, it will be served via the CM/ECF federal courts electronic portal to the names and addresses provided by the parties.

By: /s/ Joshua Jordan
Joshua Jordan, Pro Se.